# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Docket No. 2:19-cr-00177-NT |
| | ) |
| ALEX MOUSTROUPHIS, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

## ORDER ON DEFENDANT'S MOTIONS TO SUPPRESS

Defendant Alex Moustrouphis is charged with two counts of knowingly and intentionally possessing with intent to distribute fifty grams or more of a mixture or substance containing methamphetamine and forty grams or more of a mixture or substance containing fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). Superseding Indictment (ECF No. 38). Before me are the Defendant's motions to suppress all evidence seized as a result of two traffic stops. Mot. to Suppress Evid. Generated by June 24, 2019 Automobile Stop and Search (the "**June Stop Motion**") (ECF No. 57); Mot. to Suppress Evid. Generated by July 14, 2019 Automobile Stop and Search (the "**July Stop Motion**") (ECF No. 58). I held a hearing on the Defendant's motions on August 17, 2021.[1] For the reasons set forth below, I **GRANT IN PART AND DENY IN PART** the June Stop Motion and **DENY** the July Stop Motion.

---

[1]     While these motions came under advisement in April 2020, scheduling of the hearing was delayed due to the COVID-19 pandemic.

## I.  THE JUNE STOP MOTION

## BACKGROUND

On June 23, 2019, Officer Benjamin Savage and his sergeant responded to a call that the Defendant was passed out behind the wheel of a car in a parking lot. The sergeant approached the car, but Officer Savage did not interact with the Defendant. Law enforcement ultimately determined that the Defendant was not doing anything illegal and did not issue him any sort of citation. However, after this encounter, Officer Savage checked the Defendant's criminal history and saw that he had had "several drug-related contacts and incidences involving illegal drugs," including a prior drug conviction,[2] and that he had recently been on "probation"[3] for this offense.

The next day, Officer Savage pulled over a Toyota Scion in the Bayside neighborhood of Portland after noticing that the driver was not wearing a seatbelt. Bayside is consistently one of the busiest neighborhoods in Portland in terms of criminal activity and calls to the police.

After making the stop and approaching the car, Officer Savage recognized the Defendant, both from the encounter the day before and also because they had gone to school and driver's education courses together. The Defendant told Officer Savage

---

[2]    In October 2012, the Defendant pleaded guilty to drug charges in another case in this Court. *United States v. Moustrouphis*, 2:11-cr-141-GZS (ECF Nos. 113, 114). On February 13, 2013, the Defendant was sentenced to sixty months in prison and four years of supervised release. *United States v. Moustrouphis*, 2:11-cr-141-GZS (ECF Nos. 125, 127). He was released from prison around April 8, 2016. On August 8, 2018, the Defendant had his supervised release revoked, and he was sentenced to six months in prison. *United States v. Moustrouphis*, 2:11-cr-141-GZS (ECF Nos. 151, 152). He was released from custody on January 14, 2019.

[3]    I assume that this is a reference to the Defendant's stint on supervised release, which had ended (after being revoked) less than a year earlier.

that his car had been totaled and that the Scion he was driving was a rental car. This was suspicious to Officer Savage because, according to his training and experience, drug traffickers and drug users often use rental cars. Officer Savage also contends that in the course of this interaction, the Defendant appeared nervous and continuously avoided eye contact. However, Officer Savage acknowledged at the hearing that, in the course of the traffic stop as a whole, the Defendant was polite and cooperative, and that during at least some portion of the stop, he stood up straight and was "[f]or the most part" looking at Officer Savage. Officer Savage's cruiser cam video shows that during the first part of the stop, while Officer Savage was back in his cruiser performing license and registration checks, the Defendant had his arm dangling casually out of the driver's side window. After the Defendant was removed from the car and was asked about drugs, the cruiser cam shows that the Defendant became visibly fidgety.

The Defendant provided Officer Savage with his license and the car rental agreement, and Officer Savage also took down the identifying information for the Defendant's passenger, Nicholas Foster. Officer Savage then returned to his cruiser and continued his traffic stop investigation by checking the criminal and traffic history for the Defendant and Mr. Foster. Officer Savage learned that the Defendant had a Westbrook address[4] and that Mr. Foster was under a protection order and had previously been a suspect in a "Maine Drug Enforcement incident."

---

[4]    Officer Savage testified that the Defendant's license did not show a Bayside address. His report lists a Westbrook address for the Defendant, so presumably the Defendant's license showed a Westbrook address.

Upon learning this information, just over four minutes[5] into the stop, Officer Savage asked police dispatch whether there were any available narcotics-sniffing K-9s working in South Portland. Dispatch confirmed that there was one and then notified Officer Savage that the K-9 was en route. Approximately seven minutes[6] into the stop, Officer Savage got back out of his cruiser, re-approached the Scion, and handed the Defendant back the rental agreement and his license. He did not issue the Defendant a ticket for the seatbelt violation that he had earlier observed.

At this point, Officer Savage's traffic investigation had concluded. Officer Savage stated at the hearing that, at this point, he had "totally switched gears"; that he was now "focused on" investigating drug activity rather than a traffic violation; and that he intended to detain the Defendant.

While waiting for the K-9 to arrive, Officer Savage continued this second investigation—his drug investigation—with the help of Officer Cody Forbes. Officer Savage removed the Defendant from the car, informed him that he had summoned the K-9 unit, and asked the Defendant whether he had anything in the car. The Defendant denied that there was anything in the car, and Office Savage asked him to stand on the sidewalk against a wall while he went back to the vehicle to talk to

---

[5]     In looking at the footage from Officer Savage's cruiser cam, the traffic stop begins approximately thirty seconds into the video. Because I use the initiation of the stop as the relevant starting point, to arrive at the time references I use in describing the stop, I have subtracted approximately thirty seconds from the time stamps in the video.

[6]     Officer Savage actually got out of his cruiser and handed the Defendant this paperwork closer to six and a half minutes into the stop. I use "seven minutes" for ease of reference, but, to be clear, I consider the traffic investigation to have concluded at the moment Officer Savage finished handing off that paperwork.

Mr. Foster. As Officer Savage was standing outside the passenger window, he noticed a large knife in the center console of the vehicle. He immediately asked Mr. Foster to exit the vehicle. Officer Savage conducted a pat down of Mr. Foster (with his consent) and found two cell phones. Officer Forbes did the same to the Defendant (again with consent) and found a large amount of cash in various denominations and a presumed meth pipe. Officer Savage concluded that, based on his training and experience, the cell phones and cash were indicative of drug activity.

Approximately nineteen minutes into the stop, the K-9 officer (Officer Stephenson) and his K-9 (Zak) arrived. By this point, Officer Savage believed that he had probable cause to search the Scion, and he communicated that to Officer Stephenson. Close to six minutes later, Zak entered the car. After a few minutes of sniffing, Zak alerted in the area of the center console and the backseat, and the officers began to search the car, where they found two large bags of powder later determined to be methamphetamine. They also found more cash and a digital scale. The officers placed the Defendant and Mr. Foster under arrest.

Officer Forbes subsequently transported the Defendant to Cumberland County Jail. During this trip, Officer Forbes saw the Defendant squirming around in the backseat. After arriving at the jail, Officer Forbes looked in the passenger compartment of his cruiser and saw two bags of powder, which later tested positive for methamphetamine and fentanyl.

## LEGAL BACKGROUND

For an investigatory stop to be constitutional, it must be the case that the police officer not only had reasonable suspicion of criminal activity to justify the initial stop, but also that the actions undertaken in the course of the stop were "reasonably related in scope to the stop itself" or the police otherwise had "a basis for expanding their investigation." *United States v. Dion*, 859 F.3d 114, 124 (1st Cir. 2017) (quoting *United States v. Ruidíaz*, 529 F.3d 25, 28–29 (1st Cir. 2008)). That is, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *see Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion) ("The scope of the detention must be carefully tailored to its underlying justification.").

"A seizure justified only by a police-observed traffic violation . . . 'becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission' of issuing a ticket for the violation." *Rodriguez v. United States*, 575 U.S. 348, 350–51 (2015) (quoting *Caballes*, 543 U.S. at 407). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354. "In determining the reasonable duration of a stop, 'it is appropriate to examine whether the police diligently pursued the investigation.' " *Id.* (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

A dog sniff "is not an ordinary incident of a traffic stop" and "is not fairly characterized as part of the officer's traffic mission" but rather is "aimed at 'detecting evidence of ordinary criminal wrongdoing.' " *Id.* at 355–56 (quoting *City of*

*Indianapolis v. Edmond*, 531 U.S. 32, 41 (2000)). As a result, a dog sniff cannot extend the length of an otherwise-lawful traffic stop. The "critical question," then, is whether conducting the dog sniff adds *any time at all* to the stop. *Id.* at 357.

There is no *de minimis* exception to the bright-line rule that a traffic stop cannot be prolonged any longer than necessary. *See generally id.* at 350–53 (reversing Eighth Circuit's conclusion that a dog sniff that caused only a "seven-or-eight-minute delay" to a traffic stop constituted a *de minimis* intrusion on the defendant's personal liberty and was thus constitutional), 356–57. "[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Id.* at 350.

This also means that the overall length of the stop is irrelevant—all that matters is whether the stop exceeded the time needed to complete the tasks tied to the traffic infraction (or the time in which such tasks reasonably should have been completed). *See id.* at 357 (holding that an officer cannot "earn bonus time to pursue an unrelated criminal investigation" even if he "complet[es] all traffic-related tasks expeditiously"); *United States v. McCarthy*, 77 F.3d 522, 530 (1st Cir. 1996) ("There is no talismanic time beyond which any stop initially justified on the basis of *Terry* becomes an unreasonable seizure under the Fourth Amendment." (quoting *United States v. Quinn*, 815 F.2d 153, 157 (1st Cir. 1987))).

While a traffic stop cannot be prolonged beyond the time necessary to complete the purpose of the stop, "[r]easonable suspicion may nonetheless develop during the course of an ordinary traffic stop so as to justify extending the seizure beyond the

time needed to accomplish its original purpose." *United States v. Ramdihall*, 859 F.3d 80, 90 (1st Cir. 2017). This is because a traffic stop is an evolving situation. It "more closely resembles an ongoing process" than "a snapshot of events frozen in time and place." *Dion*, 859 F.3d at 124 (quoting *Ruidíaz*, 529 F.3d at 29). "[T]he propriety of an officer's actions after an initial stop depends on what the officer knows (or has reason to believe) and how events unfold." *Id.* (quoting *Ruidíaz*, 529 F.3d at 29).

"[A] finding of reasonable suspicion must be premised upon 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.' " *Ramdihall*, 859 F.3d at 91 (quoting *United States v. Pontoo*, 666 F.3d 20, 27–28 (1st Cir. 2011)). That is, "[t]he officer must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch" ' of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). "[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Id.* at 125. Presence in a high crime area "is not enough to support a reasonable, particularized suspicion" of criminal activity, although it is a factor that can be considered. *Id.* at 124.

Determining the reasonableness of law enforcement behavior is "fact-sensitive" and requires consideration of "the totality of the surrounding circumstances." *Ruidíaz*, 529 F.3d at 29. It also requires "a measurable degree of deference to the perceptions of experienced law enforcement officers." *Id.*

## DISCUSSION

There is no dispute that the Defendant was not wearing his seatbelt and that, as a result, Officer Savage had a valid basis for the initial stop. So, the crucial question is whether Officer Savage unreasonably prolonged that traffic stop in order to pursue an unrelated drug investigation. I conclude that he did.

At the time that Officer Savage handed the Defendant back his license and rental agreement—approximately seven minutes into the stop (“**minute seven**”)— Officer Savage had completed his traffic investigation. He had run checks on the Defendant and Mr. Foster. He had decided not to issue a ticket. And at this point, as Officer Savage conceded at the hearing, he had “totally switched gears” and had begun to investigate a drug crime rather than a traffic violation. Thus, under *Rodriguez*, Officer Savage’s authority to continue this seizure—that is, to expand the scope of his investigation and prolong the stop—depends entirely on whether, at minute seven, he had reasonable suspicion that illegal drug activity was afoot.[7] Accordingly, at this stage of the analysis, I must disregard any of the evidence that was discovered after minute seven, such as the knife, the cell phones, the cash, the

---

[7]     It does not matter that Officer Savage could have prolonged the stop had he chosen to write a ticket. Police officers do not earn “bonus time” to effect additional investigations by completing their traffic investigations expeditiously. *Rodriguez v. United States*, 575 U.S. 348, 357 (2015); *see United States v. Morganstern*, 512 F. Supp. 3d 31, 37–38 (D. Me. 2020) (“It is true that *Rodriguez* spoke of ‘when tasks tied to the traffic infraction are—or reasonably should have been—completed.’ But that was in the context of setting a limit on the length of the stop, not prolonging it.” (internal citation omitted) (quoting *Rodriguez*, 575 U.S. at 349)). What matters is that Officer Savage *did* complete his traffic investigation, not that he was necessarily *required* to have completed it.

meth pipe, the K-9 alert, and, of course, what was ultimately found inside of the Scion.[8]

The Government contends that the facts that had developed by minute seven gave the police the reasonable suspicion needed to prolong the search. The Defendant disagrees. Officer Savage knew the following information by minute seven: (1) the Defendant was stopped in Bayside, which has a higher crime rate than other areas in Portland; (2) the Defendant did not live in Bayside; (3) the Defendant had a prior drug history; (4) Mr. Foster had a drug history; (5) the Defendant had been sleeping in his car the day before the stop; (6) the Defendant was driving a rental car; and (7) the Defendant was acting nervous.

The inculpatory nature of many of these facts is undercut by context. First, I consider the Government's argument that the Defendant was in a "high crime" area. Presence in a high crime area is a legitimate factor to consider in determining the existence of reasonable suspicion, but it is not itself sufficient. *See Wardlow*, 528 U.S. at 124. I do not doubt the officers' testimony that the Bayside area has a higher call rate for police services and more illegal drug activity than other Portland

---

[8]     The Government repeatedly emphasized at the hearing the small amount of time it took to call for the drug-sniffing K-9. But *Rodriguez* made clear that *no* additional time may be added to a traffic stop in order to conduct an unrelated investigation without reasonable suspicion to support that investigation. *See* 575 U.S. at 350–53 (holding that adding seven or eight minutes to the stop was unconstitutional), 357 (holding that "a traffic stop 'prolonged beyond' [the time reasonably required to complete the stop's mission] is 'unlawful' " (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005))).

    Similarly, the Government's argument that Officer Savage "was actively pursuing the investigation while waiting for the dog" is beside the point. The investigation that Officer Savage "was actively pursuing . . . while waiting for the dog" was a *drug* investigation, not a traffic investigation. And because by the time the traffic investigation had concluded, Officer Savage had not yet developed reasonable suspicion to conduct that drug investigation, he lacked the authority to detain the Defendant while he conducted it.

neighborhoods due to the presence of low-income housing, homeless shelters, and social service agencies. But Bayside is best described as a mixed area, home to high-end grocery stores, fine restaurants, offices, medical suites, banks, gyms, and more upscale housing and stores.[9] The stop occurred in full daylight on a Monday at about 6:50 pm across the street from two high-end restaurants and Portland's main post office. The term "high crime area" is relative and is not a very precise description, particularly when high crime areas in bigger cities are considered.

Second, I consider the fact that the Defendant did not live in the Bayside area. People drive through neighborhoods in which they do not live all the time, particularly when the area contains the type of commercial facilities, stores, and restaurants that are found in Bayside. Further, the Defendant lived in Westbrook, which is less than seven miles due west of the Bayside area. It is reasonable to assume that many people from Westbrook take advantage of the stores and restaurants in the Bayside area.

Third, while an individual's criminal history is a relevant factor when evaluating the existence of reasonable suspicion, *Dion*, 859 F.3d at 127, even felons are not forever shrouded in a cloud of reasonable suspicion. Officer Savage testified, without elaboration, that the Defendant had "several drug-related contacts and incidences involving illegal drugs." There is evidence in the record of his prior federal conviction, but the Government offered no details about any other "drug-related

---

[9]     The record contains maps of the Bayside area, as well as some evidence of the commercial businesses there, but I also take judicial notice of the breadth of stores and services located in the area, just blocks away from the Federal courthouse.

contacts." The same is true for Mr. Foster's drug history. Officer Savage testified that Mr. Foster had "drug-related contacts" and that he was previously a suspect in a "Maine Drug Enforcement incident." Without further details, the fact that Mr. Foster had some prior involvement in drugs adds little to the analysis.

Fourth, Officer Savage testified that a day prior to the arrest, he and his sergeant had encountered the Defendant, who was sleeping in his car while parked at a gas station/convenience store in a different Portland neighborhood. Officer Savage did not personally interact with the Defendant on this occasion, and, given that the officers did not determine that the Defendant was doing anything illegal, I do not have sufficient information to infer that the Defendant was under the influence of controlled substances at the time.

Fifth, there was testimony that drug dealers frequently use rental cars in order to impede law enforcement's ability to trace the car back to them. Of course, rental cars are also driven for a number of lawful reasons. In this case, the Defendant rented the car in his own name, which slightly undercuts this fact's evidentiary value.

Finally, as to the Defendant's purported nervousness, he did not seem particularly nervous in the cruiser cam footage until he was removed from the car (after minute seven) and was informed that a K-9 unit was being brought in. But even assuming his nerves were apparent, "[n]ervousness is a common and entirely natural reaction to police presence." *United States v. McKoy*, 428 F.3d 38, 40 (1st Cir. 2005); *cf. Dion*, 859 F.3d at 119, 127 (distinguishing *McKoy* where defendant was so visibly

and unusually nervous that the police officer could see his carotid artery pounding and could see his pulse throbbing in his stomach under his shirt).

While any one of these facts, "standing alone, might not support reasonable suspicion," the Supreme Court has "flatly rejected just this sort of 'divide-and-conquer analysis' because it is inconsistent with the requirement that courts examine the totality of the circumstances." *Dion*, 859 F.3d at 125 (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). I thus must consider whether together these facts add up to reasonable suspicion, but even doing so, I find that they fall short. In my view, it is not reasonable to suspect that a Westbrook resident driving a rental car through Bayside during dinner hours is engaging in drug activity, even if that person has previously been convicted for criminal activity involving drugs and is showing some signs of nervousness. That sweeps too broadly.

Because under existing Supreme Court precedent, I must confine my analysis to the time in which it took Officer Savage to complete the investigation of the seatbelt infraction, the information that was learned after this point cannot be considered. The stop had already reached its constitutional limit, and any evidence discovered after minute seven was unlawfully obtained. To the extent that the June Stop Motion seeks to suppress evidence collected from the June Stop after minute seven, the motion is **GRANTED**.

## II. THE JULY STOP MOTION

## BACKGROUND

After being arrested as a result of the June Stop, the Defendant was released on bail on June 25, 2019. As a condition of his bail, the Defendant agreed to "submit to searches of [his] person, vehicle, and residence . . . upon articulable suspicion." Bail Conditions (ECF No. 58-1).

On July 13, 2019, Officer Nicholas Gowen was driving southwest on Lancaster Street (in Bayside) in a marked car, with Officer Eric Johnson as his passenger, when the officers passed a car going the opposite direction. Officer Gowen recognized the Defendant as the driver and knew that the Defendant had recently been arrested in the same neighborhood[10] after being found in possession of a large quantity of methamphetamine while driving a rental car. The officers were also suspicious because they knew that the Defendant did not live in Bayside, and he was driving another car that looked like a rental (a late model sedan with Florida license plates).[11] The officers thus decided to follow the Defendant.

Officer Gowen made an immediate U-turn around the intersection of Alder Street, but the Defendant had already disappeared from view. The officers concluded

---

[10]     The June Stop had taken place approximately one-quarter mile away from this sighting.

[11]     Officer Gowen also knew that a source of information deemed credible by the Maine Drug Enforcement Agency had recently informed law enforcement that the Defendant was engaged in drug trafficking and was often armed with a gun. Given the dearth of information about this informant and this tip and the fact that this is apparently thirdhand information, I have insufficient information to assess the reliability of this tip. *Cf. Florida v. J.L.*, 529 U.S. 266, 270 (2000) (distinguishing between relying on an anonymous tip versus a tip from a known informant). This information thus does not offer much to my analysis.

14

that for him to have done so, he must have quickly accelerated, likely in an attempt to avoid the police. And given the twenty-five mile-per-hour speed limit in the area, they assumed that the Defendant must have been speeding. Given their suspicions, the officers sought to locate the Defendant.

They began by making a left turn onto Elm Street, and as they drove down Elm and passed Kennebec Street, Officer Johnson saw the Defendant at the end of Kennebec, making a right turn onto Chestnut Street, heading away from Marginal Way. The officers were further convinced by the amount of distance that the Defendant had traveled that he must have accelerated quickly in an effort to evade them. In the course of this pursuit, the officers also confirmed with dispatch that the car the Defendant was driving was a rental car and that he had been released on bail conditions after his June arrest.

The officers continued down Elm, made a right onto Marginal Way, turned right onto Chestnut, and made a left onto Somerset Street. While driving northeast on Somerset, Officer Johnson saw the Defendant driving on Chestnut—only a block from where the officers had seen him a few minutes earlier and now driving back *towards* Marginal Way—and making a left onto Somerset. The officers made another U-turn and caught up with the Defendant as he turned right onto Elm from Somerset. The officers then followed the Defendant as he made a left onto Marginal Way and another left into a commercial parking lot. Shortly before the cars turned into the parking lot, the officers saw the Defendant glancing over his shoulder towards the police cruiser, twisting in his seat, and making "furtive movements" that looked like

he was reaching behind him with his right hand and manipulating something that the officers could not see.

After the Defendant pulled into the parking lot, he parked, although as he was pulling into the parking space, the officers turned on their lights and effectuated a traffic stop (the "**July Stop**"). Immediately after the Defendant parked, the passenger, Christopher Hyson, opened his door and jumped out of the car, but Officer Johnson ordered him to get back in. The Defendant also opened his door but did not yet get out. The officers concluded from this behavior that Mr. Hyson and the Defendant were attempting to quickly exit the car in order to distance themselves from any contraband that might have been inside.

Officer Gowen approached the Defendant, and Officer Johnson approached Mr. Hyson. As the Defendant stepped out of the car, Officer Johnson saw a piece of plastic that he recognized as being a Dominican tie fall from the Defendant's lap onto the driver's seat.[12] Mr. Hyson confessed to Officer Johnson that he had methamphetamine and a knife in his pockets. Officer Johnson then patted down Mr. Hyson and removed the methamphetamine and the knife.

Officer Gowen patted down the Defendant and felt a wad of money in his pants pocket.[13] The Defendant said that a friend had rented the car he was driving but that

---

[12]     The "Dominican tie" refers to a method of packaging drugs. The drugs are placed in the corner of a plastic baggie, the baggie is twisted tightly, and the corner containing the drugs is pulled away from the rest of the baggie.

[13]     It was around this time that Officer Gowen told the Defendant that he did not yet believe that he had reasonable suspicion to search the car. At the hearing, the Defendant appeared to conclude from this statement that Officer Gowen also did not believe he had reasonable suspicion to *stop* the car and then extrapolated that he therefore did not *have* reasonable suspicion to make the stop. Even assuming that Officer Gowen genuinely believed that he did not have reasonable suspicion to search

16

he did not know the name of the friend. Officer Gowen then asked the Defendant what his name was, and the Defendant responded that he was having a "bad lapse of memory."

At this point, Officer Gowen looked into the car and saw the Dominican tie, which he reached into the car to grab. A few minutes later, the officers proceeded to search the car, ultimately finding, among other things, a meth pipe with some drug residue; two large bags of white substances, one of which tested positive for a cutting agent and the other of which tested positive for methamphetamine; and a firearm.

## LEGAL BACKGROUND

"[A] Fourth Amendment seizure occurs 'whenever a police officer accosts an individual and restrains his freedom to walk away.'" *United States v. Tanguay*, 918 F.3d 1, 5 (1st Cir. 2019) (quoting *Terry*, 392 U.S. at 16). The touchstone is whether there was "a show of authority," meaning that, based on the totality of the circumstances, a reasonable person would have believed that he was not free to leave. *Id.* Such a show of authority is clear where "the officer expressly asserts it through a command." *Id.* at 6; *cf. United States v. Espinoza*, 490 F.3d 41, 50 (1st Cir. 2007) (concluding that a seizure occurred where an officer ordered a driver to shut off his engine). Viewing a police officer's blue lights in one's rearview mirror is an equally telling sign of a seizure. *See Tanguay*, 918 F.3d at 8; *Brendlin v. California*, 551 U.S.

---

the car or to make the stop, such a subjective belief does not bear on my analysis. *Cf. Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

249, 255 (2007) ("The law is settled that in Fourth Amendment terms a traffic stop entails a seizure . . . .").

A police officer may conduct a traffic stop when he or she has a reasonable suspicion of criminal activity. *United States v. Pierre*, 484 F.3d 75, 83 (1st Cir. 2007). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than [a] preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making [a] stop." *Wardlow*, 528 U.S. at 123. Presence in a high crime area plus unprovoked flight upon noticing police can be enough to trigger reasonable suspicion. *See id.* at 124 ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.").

## DISCUSSION

### I.    **The Traffic Stop**

I begin with the initiation of the July Stop. The Government objects to the July Stop being characterized as a traffic stop and instead refers to it as a *Terry* stop. Gov't's Consolidated Obj. to Def.'s Mots. to Suppress Evid. ("**Gov't's Opp'n**") 8 (ECF No. 62). It is unclear why the Government seeks to draw this distinction, since there is little legal daylight between the two. *See Rodriguez*, 575 U.S. at 354; *Dion*, 859 F.3d at 123 ("A routine traffic stop is more akin to a *Terry* stop than an arrest."). Because the officers turned on their lights just before the Defendant completed parking and because the officers prevented the Defendant and Mr. Hyson from

leaving the car (at least initially), I consider the July Stop to have been a traffic stop. Regardless of how this interaction is characterized, it is clear that the Defendant was seized, which the Government acknowledges. *See* Gov't's Opp'n 8 (referring to the Defendant's "temporary detention" (capitalization deleted)). And because the Defendant was seized, reasonable suspicion was required to effectuate this seizure. The question, then, is whether the officers had reasonable suspicion to conduct this traffic stop. I conclude that they did.

At the time they conducted the stop, the officers knew the following information: (1) the Defendant did not live in Bayside; (2) he was driving a rental car (again), which can be indicative of drug trafficking; (3) the circumstances and result of the June Stop (i.e., the Defendant had been arrested after being caught driving a rental car with a large amount of methamphetamine inside), which had occurred just a few blocks away only a few weeks earlier; (4) Bayside has a higher crime rate than other areas in Portland; (5) the Defendant had a prior felony conviction involving drugs; (6) the officers witnessed the Defendant heading down Chestnut Street away from Marginal Way and then, a few minutes later, witnessed him driving back down Chestnut in the opposite direction; and (7) when the officers finally caught up to the Defendant, as they were following him, they saw him glancing over his shoulder and making "furtive movements" with his right hand like he was trying to manipulate something behind him.

I am satisfied that these facts, in combination, add up to reasonable suspicion that criminal activity was afoot. The fact that after the Defendant spotted a police

car he was driving swiftly[14] up Chestnut Street away from Marginal Way and then, moments later, down Chestnut towards Marginal Way suggests that the Defendant was trying to shake the police. This act of evasion plus the facts that the Defendant was arrested for drug activity in the same neighborhood just a few weeks prior and the furtive movements being made in the car are sufficient to provide the reasonable suspicion necessary for the stop.

While there are certainly innocuous explanations for the Defendant's behavior, "a fact that is innocuous in itself may in combination with other innocuous facts take on added significance." *Ruidíaz*, 529 F.3d at 30. "The relevant question is not whether the officers could have interpreted the response in some more benign way but, rather, what degree of suspicion" was reasonable "in light of the surrounding circumstances." *Id.* at 32. In context, the Defendant's behavior was suspicious, and it was reasonable for the officers to suspect illegal drug activity and to effectuate a traffic stop to investigate these suspicions.

## II.    The Search of the Car

The Defendant's bail conditions permitted searches of his vehicle upon articulable suspicion, which I understand to mean reasonable suspicion. The

---

[14]    At the hearing, the Defendant appeared to assume that he was stopped for speeding, arguing that there was no reasonable suspicion that he was speeding and that the stop was therefore unlawful. Whether there was reasonable suspicion that the Defendant was speeding is beside the point because there *was* reasonable suspicion that he was engaging in illegal drug activity. In order to effectuate a traffic stop, "a police officer must have reasonable, articulable suspicion of an individual's involvement in *some* criminal activity," *United States v. Dion*, 859 F.3d 114, 124 (1st Cir. 2017) (emphasis added), not necessarily a traffic crime.

Defendant does not challenge the validity of these bail conditions and only appears to question whether such reasonable suspicion existed.

Once the officers conducted the July Stop, not only did the reasonable suspicions that led them to stop the car persist, but they quickly multiplied. The Defendant and Mr. Hyson hurriedly attempted to exit—and thereby distance themselves from—the car. Officer Johnson found methamphetamine in Mr. Hyson's pocket. Officer Gowen found a large amount of cash in the Defendant's pocket. The Defendant claimed to be unable to remember his own name or the name of his "friend" who had rented the car (even though it was the Defendant who had rented the car). And both officers noticed the distinctive Dominican tie.

All of these facts provided the reasonable suspicion needed to search the car pursuant to the Defendant's bail conditions. The stop and search of the car were lawful, and the motion to suppress evidence seized during the July Stop is **DENIED**.

## CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** the Defendant's June Stop Motion (ECF No. 57). All evidence obtained in the course of the June Stop after minute seven is hereby suppressed. The July Stop Motion (ECF No. 58) is **DENIED**.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 9th day of September, 2021.